-Peck, J.
dissenting.
Foreman was indicted in the circuit court of M’Minn county, for the murder of John Walker. They were both natives of the Cherokee nation, and resided within the bounds allotted to that nation, by the treaties entered into between the United States and Cherokees. Foreman pleads to the jurisdiction of the court: avers that it belongs .to Cherokees to try him for the crime; the same having been committed within that jurisdiction, and beyond the rightful jurisdiction of the State of Tennessee, and pleads and relies upon the several treaties now in force. There was a demurrer to the plea. The circuit court overruled the demurrer and allowe_d the plea, from which judgment of the court, the State brought the case by appeal into the supreme court.
Seven years ago, the question before us would not have been considered one of difficulty. Having in all previous time conceded to the Cherokees the right to govern themselves as a nation, there was no plea urged from any quarter, that treaties should have new constmctiqns, or the repose of that people be disturbed. The construction of *356 tlie federal constitution, so far as it relates to the Indian tribes, was had at an early day alter its adoption, in the passage of the Intercourse act of congress. Subsequently the views that our wisest and best legislators had upon the subject, as seen in the acts of congress, were sustained and carried out by .the federal judiciary. Some highly esteemed for wisdom, honesty and patriotism, were of opinion that the nation had the right even to change her code of laws, and make nearer approaches to the rules and forms of the surrounding white community. This was then thought to be in accordance with the spirit of treaties; in one of which, we have the language of our present chief magistrate, adopting the language of the then president of the United States, addressed to the Cherokees, then divided in opinion on the policy of removing to the west. “The United States, my children, are the friends of both parties, and as far as can be reasonably asked, they are willing to satisfy the wishes of both. Those who remain, may be assured of our patronage, our aid, and good neighborhood. Those who remove, when established in their new settlement, we shall still consider as as our children, give them the benefit of exchanging their peltries for what they will want at our factories, and always hold them firmly by the hand. And whereas, the Cherokees relying on the promises of the president of the United States,” &c., treaty of 1817. The spirit of all the treaties with the Cherokees, as taken in connection from 1785 up to the present time, may safely be thus summed up. Perpetual peace, restoration of prisoners, grant of lands by the nation, express designation of boundaries, to abstain from commission of crimes against the whites, restoration of property stolen or compensation therefor, to give up offenders taking refuge amongst them.
That retaliation shall cease. The exclusion of die whites from the lands retained by the Indian nation.
Acknowledgment of the protection of the United States, and of no other sovereign whatever.
*357 That congress shall have the sole and exclusive ° _ i . . of regulating trade with the Indians, and managing all their affairs in such a manner as that body-shall think proper. (Treaty of 1785). Relying upon the justice of the United States, shall have a deputy at congress. The right to construct and pass certain roads through the nation, granted by provision in the treaties.
A solemn guaranty to the Cherokees of all their lands not ceded. That it shall be against the law for white men to settle on such lands, and such intruders to be punished as the Indians may think proper. None shall go into their territory without a passport; none hunt upon their grounds. That the United States will assist the Cherokees in the arts of civilization, that they may become herdsmen and cultivators, rather than remain hunters. The grant of annuities as part of the consideration for the lands ceded.
Taking it for granted, that these stipulations have been entered into by powers competent to make them — that they are to stand unbroken on either side — can the act of assembly before us, extending the jurisdiction of our courts over these people, within the bounds of Tennessee, be construed to stand, and be consistent with them?
We are to consider also, that the nation claiming under these treaties exemption from our laws, has not lost its character by diminution of its numbers, or by nonuser of the rights formerly' guarantied — no new treaty has abro-, gated the former — so far from it, they are recognized as in full force by act of congress, 1834, and we are to suppose the United States true to the engagements on her part, by parental care — has made the nation wiser in counsel, and even more tenacious of her rights, in proportion as that nation has become richer in goods; of course the right to govern, touching that property, the security of life, and their liberty, has become dearer to them now, than when hunters.
We are, therefore, to view them in all other respects, as they were when the treaties were made. A people *358 unpractised m our language or our laws. Did such a na~ . J , r . . , , tion, irom tlie premises betore us, anticipate when signing such treaties, one object of which was, protection against encroachment, a protection guarantied by the power that controlled the surrounding communities, that they were to surrender up at the pleasure of these communities; that all their rights of government were to depart, and that without the right of representation, unlettered and unskilled in our language, they were, through their interpreters, to ask for information touching the new rules that fixed their. destiny? It is impossible, the very suggestion of it, before the signing, would have produced the rejection of the whole. The encroachments of the surrounding States produced the animosities which made treaties necessary. The Indian was the last that even dreamed of being thus taken by surprise; and at the day of signing the last treaty in the series, it would, had it been named, have been no less startling to the white man. If, upon general principles, we should find but little difficulty in the solution of the question, it will become less difficult, when the subject shall be examined more in detail, and more directly with a view to those clauses in the treaties having a bearing upon the question, compared with the constitution of the United States.
An argument from some unknown hand, which has went its round in the papers, and from which, most of the debates in favor of State rights, in this particular, has been based, assumes, that because the constitution of the United States extends no farther than to give power to congress to regulate “commerce” with the Indian tribes, that this grant of power does not include within it the grant of power to exercise jurisdiction over those tribes, and therefore, the act of congress which regulates the “intercourse” with them, is not authorized by the constitution.
Although I think for myself, that there is in the argument some refinement upon the meaning of the terms “commerce” and “intercourse,” still the whole assumed *359 may be admitted, and yet it will not be difficult to show that the argument does not reach the case before us. For it may be true, that the clause, “congress shall have power to regulate commerce with foreign nations, and among the several States, and with Indian tribes,” will, of itself, not communicate the power to pass a law giving to the federal judiciary jurisdiction. Yet it may be true, that the power may be communicated under the clause,, “This constitution, and. the laws of the United States, which shall be made in pursuance thereoí, and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land, and the judges in every state, shall be bound thereby, any thing, in the constitution or laws of any State 'to the contrary notwithstanding.” I am aware it has been denied that the treaty of Hopewell is in force, for it is assumed that the treaty of Hopewell was abrogated by the war which succeeded it; still, if in subsequent treaties it was recognized, or any part of it, for so much it would be revived and kept in force.
I assume that the treaties with the Cherokees, are treaties within the meaning of the federal constitution. When made, they are ratified as other treaties. We call them so in our courts of justice because they bear' that impress upon their face. When they give us title or right, we so treat and speak of them, and it would be ungracious to deny them the name or character, when the parties on the oilier side demand a right secured by them. Scarce a year passes, but we hear of the ratification of and Indian treaty, and perhaps more frequently hear of a decision in some court, State or federal, on points growing out of these compacts.
Being treaties, what do they contain, upon the point before us? I will cite a few clauses. Treaty of Hopewell, article 3d. “The said Indians, for themselves and their respective tribes and towns, do acknowledge all the Cjierokees to be under the protection of the United *360 States of America, and of no other sovereign what" ever.”
Art. 9th. “For the benefit and comfort of the Indians, and for the prevention of injuries or oppression on the part of our citizens on Indians, the United States, in congress assembled, shall have the sole and exclusive right of regulating the trade with the Indians, and managing all their affairs in such manner as they think proper.” Treaty of Holstein, article 2d. The Undersigned chiefs and warriors, for themselves and all parts of the Cherokee nation, do acknowledge themselves and the said nation to be under the protection of the United States of America, and of no other sovereign whatever; and they also stipulate that the said Cherokee nation will not hold any treaty .with any foreign power, individual State, or with individuals of any State. Art. 6th. It is agreed On the part of the Cherokees, that the United States shall have the sole and exclusive right of regulating their trade. Art. 7th. The United States solemnly guaranty to the Cherokee nation, all their land not hereby ceded. Art, 8th. If any citizen of the United States, or other person, not being an Indian, shall settle on any Cherokee lands, such person shall forfeit the protection of the United States, and the Cherokees may punish him or not, as they please. Article 1st. of the treaty of 1794, declares the treaty of Holstein in full force and binding in all respects.
Art. 2d. Treaty of 1798. The treaties subsisting between the present contracting parties are acknowledged to be in full and operating force, together with the construction and usage under their respective articles, and so to continue.
Art. 10th. And lastly, this treaty and the several articles it contains, shall be considered as additional to, and forming a part of the treaties already subsisting between the United States and the Cherokee nation, and shall be *361 carried into effect on both sides, with all good faith as soon as approved and ratified, &c. '
From these quotations, it is clear, that at a time when Tennesse was part óf the territory south of Ohio, and consequently, when the territory was under the jurisdiction of the United States, before the State had its name or political existence; by treaty, with the authority competent to make it, the Indians put themselves under the protection of the United States, and by express terms, excluded the exercise of any control by any sovereignty.
There is certainly much of meaning in'the terms used in many of the articles I have repeated; from 1785, at Hopewell, down through successive treaties, the same determined spirit on the part of the Cherokees has been evinced, to resist every authority except that of the United States. No one acquainted with the history of the origin of the war between this nation and tire whites, can help seeing the reason why the nation preferred relying upon the good faith, justice and. magnanimity of the general government to protect them, rather than commit that guardianship to any other community or body politic.
North Carolina had granted portions of her land beyond the treaty boundary. The grantees desired possession. Encroachments had its origin under many pretexts. The doctrine, that we being civilized, should take from the Indian, by the sword, what land was wanted for cultivation, was put forward forty years ago, just as it is now, so that the jurist of the present day should not be vain of what he deems new discoveries' in the law of. nations, deducible from -Marten, Vattel and others; either our fathers had read the books upon this subject, or they knew as much_ intuitively, as our lawyers have acquired by the aid of Puffendorf, his cotemporaries or followers. They not only assumed the right of intrusion, but they exercised it. The memory of hundreds reach back to the fact, that our fathersdid, against the express letter of the treaty of Hopewell, overrun the Indian country; and that south of *362 French Broad and Holstein, was settled as early as 1789— ’90. It was the cause of the war which the treaty of 1791 terminated, and was that which caused the guaranty of the Indian lands to be inserted in that treaty. These are facts not forgotten, and we need not the labors of the historian yet to treasure them up for us. General Washington, under the treaty of ’91, felt himself authorized, and did keep off intruders by military force; the garrison at Southwest Point was built and manned, with a view to see the treaty enforced. Mr. Jefferson followed the same course of policy; these were bright examples, set by men whose names we venerate, and whose examples it should be our pride to copy. These statesmen found in the treaties ample authority to resist every encroachment, both before and after Tennessee became a State. The question might safely be asked, what president has not enforced these treaties. They all have, and none more effectually than Mr. Madison, than whom we have not had a superior as a civilian. And the fact being as I assume it, that the intrusion of the whites upon the Indian lands, produced the war of 1789, it makes for the Indians a vei'y strong plea, that the treaty of 17S5 should be considered in force. Nay, if the fault was on the part of the whites, the plea is irresistible. Most of the treaties, upon their face, are a renewal of former friendships, rather than new treaties consequent upon intervening wars. Viewing the subject, therefore, as I am bound to do, I see nothing which restrains me from daclaring the treaty of Hopewell in force. Talcing it to be in force, the language is strong and clear to the question of jurisdiction, and indeed to all points. Art. 9th acknowledges the Indians to be under the protection of the United States, and for the benefit and comfort of the Indians, the United States, in congress assembled, shall have “the sole and exclusive right of regulating the trade with the Indians, and managing all their affairs in such manner as they think proper.” Language *363 more strong, or more pertinent, could not have been , ° r used.
Subsequent treaties, though they want the latter expressions, “exclusive right to manage all the affairs of the Indians,” certainly retain the spirit of the clause, The treaty of Holstein, Art 2d, declares the Indians under the protection of the United States, and of no other sovereign whatever. That the nation will treat with no other foreign power, or State, or with individuals of any other State.
.By this treaty, intrusion is provided against, and the Cherokees at liberty to punish such as may intrude, at pleasure. All treaties, 'by the 2d article of 1798, are to continue in force, together with the- construction and usages, under their respective articles'.' _Usages in this connection, can mean nothing less than their unwritten laws — their customs. If this is not the construction, why, in another clause of the treaty, authorize the Indians to punish intruders as they please,- their laws being authorized against whites, for a stronger reason, is authorized against their own people.
These provisions, when taken in connection, leave no doubt upon the mind of the dispassionate^ .of who is to have the whole controlling power over the Cherokees. As it must be admitted, that a nation may-put itself under the protection of another power, and-as'it is positive the Indians have done so, it follows that none other has the right to interfere; with other powers, it would be cause of war. It is the more unreasonable that any of the States should do so, seeing that they, by their senators, have ratified the stipulation in all its parts. The senate, as a body, acts for all the States, and as we settle difficulties by majorities, even if the senators of an individual State have remonstrated, the act of the others would be binding. But it is not pretended that the senators of Tennessee éver did dissent or remonstrate against any article in any treaty; so far from it, Tennessee asked for treaties. *364 received them, they were ratified by her senators, and her . . , ‘ , J n _■ . ’ citizens have derived benefits therefrom. Being the last political body that ought to complain, having made the .act in effect her own, and derived benefit, she should present a strong case indeed., to insure a hearing at the expense of her own treaties.
But it is said, Tennessee is a sovereign and independent State. That she has by the federal constitution guarantied to her, a republican form .of government. That being sovereign and republican, she may pass any law not forbidden by the constitution of the United States, or by her own constitution. Admit it. Still it will not be difficult to show, that by the passage of the act of assembly in question, the constitution of the United States is violated. The treaty making power is vested in the president and senate. When a treaty is made and ratified by that body, it becomes, by the express letter of the federal constitution, as much a supreme law of the land as the constitution itself. With the constitution before him, no man can think or speak of a treaty but with some reverence, and pay to it the same homage he would to the constitution itself, because that instrument puts the treaty upon the same footing, and all judges are commanded to obey it.
Therefore, though I think there is much in the clause which vests congress with power to regulate commerce with the Indian tribes, and that commerce and intercourse, in legal parlance, mean the same thing; there is certainly every thing wanted in the clause, declaring the effect of treaties when made. The moment it is conceded that the instruments before us are treaties, the clauses found in them foreclose argument. But an argument pressed with great zeal is, that so soon as congress admits a State into the Union, she will no longer interfere in her questions of jurisdiction. And for this, is cited the language of congress, 1783, “that the preceding measures of congress, relative to Indian affairs, shall not be con-? *365 ■strued to affect the territorial claims of any of the States, of their legislative rights, within their respective limits.” Take this language to mean every thing gentlemen contend for, it can at best apply to the States then in being. When our constitution was framed, most of the treaties we are considering existed in full force. Those who framed the constitution, were the last who contemplated that it would have the effect of annulling any clause in any treaty, or abridging a single Indian right. That instrument, the workmanship of the hands of 'our fathers, provides against the passage of laws impairing the obligation of contracts; and this was one. ,The schedule to the constitution provides in general terms, that existing contracts shall continue in force; true, this latter provision was, no doubt, intended to apply between citizen and citizen; still the terms used are broad enough to ■ cover all contracts. We had so recently felt the scourge of Indian warfare, that few felt a disposition to do any act calculated to revive hostilities. But it is fair to infer that a moving consideration with our convention was, respect for the treaties and compacts; acts emanating from a high source, commanding respect from the manner they are directed to be considered by the federal constitution.
In' those days, there existed no spirit abroad to stir up conflict between single States and the general government. Then the bonds of union were more strong, love of country prevailed, and men were willing to sacrifice much of-opinion, for the sake of that harmony among sister communities, which ought to be our pride and boast so long as we wish to exist as a nation, acknowledging one general head. ^
If we can cut off from the general government the right of jurisdiction, because we are sovereign and independent, why not by force of that sovereignty and independence, also cut off the regulation of commerce. . It is difficult to perceive why that clause of the federal constitution *366 shall not yield as readily as the other, declaring the force i sy* n and effect ox treaties.
Under the treaties with die Cherokees for near fifty years, we have conceded to them, their usages and customs; the unwritten laws were amply sufficient for the nation when stronger in numbers, and more rude in manners. And at this day, for the first time, we have made it a question of state pride, that for a few specified crimes we shall take into our hands the right of trial and punishment. I will not take it upon myself to judge how much the measure is calculated to exalt us by becoming the hang-men or jailors of the Indians. At all times, the task of inflicting punishment is not an enviable office, necessity alone justifies it, and the care, toil and costs we incur with our own offending people, is sufficient cause of complaint. But arguments touching what is convenient, I shall leave to others. It is enough for me to know that the Cherokees are protected by treaty stipulation, in the exercise of their usages and customs, and against intrusion upon the territory allotted them. It is impossible to tolerate the enforcement of an act of assembly by our mandates and officers beyond those limits, without violating the treaties we have been considering.
It is urged that unless we enforce the act, offenders will go unpunished, that a necessity now exists for the enforcement of a law of the State extending jurisdiction. Certainly the question viewed in this aspect is a delicate one; delicate, because it is rather political than legal; rather depending upon facts than upon law.
The legislature have in effect said by the passage of the act, that such a law is necessary. The Cherokee with his own law in one hand, and the treaty in the other, opposes the measure as an innovation uncalled for in fact, and expressly prohibited by treaty; while I bow with the utmost respect to constitutional law, and will enforce it, how am I to sustain this act of the legislature? Am I to take the act passed, as conclusive of the fact of necessity *367 existing? The act does not declare so in express terms. Then I am'to take it by implication, and that too against the express terms of treaty stipulation; against facts every day passing upon our borders. We'know the fact to bej that the agent of the Cherokees was at his post in the nation at the time die act in question was passed, and has been so continued ever since. If I did not personally know this fact, the acts of Congress of 1834, ch. 131. (sec. 29, proviso) ch. 162, sec. 4: admonishes me the fact must be so; for by these the agency is recognized and the intercourse law in force. The morning gun of the military upon the Indian border gives warning that the flag of the union there waves, and that the intruder must beware. I am bound to presume, that the-President of the United States has performed his duty by appointing the agent, and executing the laws of congress which protects the rights of these people, for his oath compels him.
Against all these the newspaper publications weigh not a feather in the scale. Political notions of expediency, about which honest men may differ, weigh as little; for there are high and prominent marks at which we are compelled to look; die first obligation of every man is ^to observe and regard the constitution, with the judge it is emphatically so. The tyrant’s plea, that of necessity, wherever advanced should be watched with caution. If I even knew the fact of existing necessity; to which of die mandates shall I confine myself? It is said to the act of assembly. My answer is jthat between conflicting mandates the treaty is the highest, and the-act being subordinate must yield; and certainly jt becomes the stronger when consistent with the fact.
- The example of other States áre quoted upon me. It is urged that Alabama, Georgia and North Carolina, have severally passed such laws, and the judges, of these States will enforce them. My answer is, that I will not sin if others do. Again, it is said New York and Ohio have done'the same thing, and that their laws have been en *368 forced. What the terms of the treaties with the tribes there are, I know not, neither do I know the exigencies that produced their laws; they may have been superinduc-éd by the Indians themselves.
It is enough for me to know that the treaties we are considering oust me of jurisdiction, where the Indian urges the plea, and where I have no power to act myself, it were useless to enquire into the power of others, thereby to seek an excuse for acting for myself. If I have not the power, the first named States had not, and there is an end of the question.
In arguing the case before us, any one viewing the . grounds occupied, will find much room for amplification and illustration; but the very point having been before the federal judiciary, to whom, in my opinion, it belongs to decide it; our own courts in the case of Winton and Cornet, and in Mrs. Pack’s case having went in accordance with the supreme court of the United States, in the cases against Georgia; and the circuit judge i.i this case having followed all these, if 1 doubted, I would not reverse the opinion he has given. But I do not doubt it.
With me, the supposed discrepancies between the cases of Tassals, &c., and Georgia and the case of M’Intosh, weigh nothing; in the latter case, the question was, on the ultimate right of domain; in this caseras in that of Tassals, the question is one of jurisdiction.
Originally the Indian may have had no right; discovery and conquest, aided by the gifts of the popes, or crowned heads may have swept them all away, ( if géntlemen will have it so, which is not admitted;) still, if by treaty, the nation acquired rights by the concessions of their conquerors, such rights must be protected, even if the concessions had their origin in our generosity. So long as we, as a people, profess to be governed by written compacts, rather than by the sword or the strong arm of power, so long will treaties even with the red man be our *369 guide, and it will be a matter of pride and boast, that we 0 , x are just even to the weak.
But, to the act of assembly itself; we have often held that acts of assembly, unequal in their operation, and partial in their effect, are unconstitutional and void. This law is partial and unequal in its operation. If the Chero-lcees are to be considered part of our own community, and subject to our laws, why has it been extended only to three specified offences and close there? On this ground it is a partial law, for it stops short of carrying forward the penal code, including only murder, rape and larcency. It is unequal, because the law does not open the courts as auxiliary to the attainment of*justice on part of the Indians, in the innumerable cases of right and wrong, which in the nature of things must arise. By our bill of rights, “courts shall be open, and every man for an injury done him, shall have redress by due course of law.” If the Indian, living in his nation as a man, had a right to have 'the courts open to him, and redress for injury by due course of the laws of Tennessee, then the act contains a useless provision. But the legislation upon those isolated subjects, proves that the general laws of the state do not so apply. In other words, the lengthening the arm of our officers beyond the limits of what was formerly our acknowledged jurisdiction, only to reach three specified offences cpmmitted beyond that jurisdiction, is a partial law. And to leave the arm of the officer powerless, when the Indian in his nation asks redress, makes the provision unequal. But above all, the act carries upon its face the antidote to its effect. It recognizes the operating force of all the treaties. Acknowledging as it thereby does, a controlmg letter, it is felo de se and void.
I give the foregoing as the result of .my most serious deliberations upon this vexed question. Upon the points raised, I could not say less, and my convictions forbid that I should declare otherwise. The constituted authorities of my country I bow to with reverence; but as all *370 authority emenatesf from the constitutions, state and federal, I make them the basis of my argument, rather than recur to the law of nations, knowing that where we have the rule at home, that must govern rather than transatlantic learning, much of it growing out of feudal systems, and governing the relations of foreign states and empires; but which if resorted to, would sustain me both in the ]etter and spirit.
I am for affirming the judgment by sustaining the plea.
Judgment reversed.- (a)

 The argument furnished the court at their request, by Geo. 3 Yerger, will be found in the appendix.